**In the Matter of REGO CRESCENT CORP., Debtor.**

**REGO CRESCENT CORP., Plaintiff,**

**v.**

**FLAGSHIP AIR SERVICE TRANSFER, INC., Defendant.**

**Bankruptcy No. 179–03854.**
**Adv. No. 182–0144.**

United States Bankruptcy Court,
E.D. New York.

May 20, 1983.

Abraham, Silver & Rosenberg, New York City, for plaintiff; I. Louis Winokur, Jamaica, N.Y., and Jacob W. Abraham, New York City, of counsel.

William J. Kelly, New York City, for defendant.

MANUEL J. PRICE, Bankruptcy Judge.

This is an adversary proceeding in which the plaintiff, Rego Crescent Corp. ("Rego Crescent," or "the Debtor"), seeks specific performance of a contract for the sale of land entered into with the defendant, Flagship Air Service Transfer, Inc., ("Flagship") on October 6, 1980. The defendant has interposed an answer and counterclaim in which it contends that it refused to accept the title to the property which was tendered to it because it was not insurable in accordance with the terms of the contract of sale and demands the return of its $5,000 deposit and the costs of a survey and title search which it paid for in connection with the purchase of the property.

The plaintiff, which had filed a voluntary petition under Chapter 11 of the Bankruptcy Reform Act of 1978 ("the Code"), 11 U.S.C. § 1101 et seq., on December 19, 1979, is a debtor in possession and had obtained the approval of the contract of sale at issue here from its unsecured creditors' committee which had been appointed pursuant to section 1102(a)(1) of the Code, 11 U.S.C. § 1102(a)(1), and from this court. The debtor-plaintiff had been authorized to commence this action by my order dated February 17, 1982.

The following are the facts adduced at the trial before me:

The contract of sale, defendant's Exhibit E, which had been entered into by the parties in this matter, provides for the sale by Rego Crescent to Flagship of a parcel of real estate designated on the tax map of the City of New York for the County of Queens as Block 12050, Lot 223, (the "Rockaway Boulevard property"), located in the Borough of Queens, City of New York for $65,000 payable as follows:

$5,000 on the signing of the contract $16,750 on the delivery of the deed, and $43,250 by a purchase money bond and mortgage executed by the purchaser.

The contract provides that:

"Purchaser agrees to employ U.S. Life Title Co., to examine and insure title to the premises."

And it also provides that:

"16. The seller shall give and the purchaser shall accept a title such as U.S. Life Title Co., a Member of the New York Board of Title Underwriters, will approve and insure."

It also provides the following:

"6. Said premises are sold and are to be conveyed subject to:

a. Zoning regulations and ordinances of the city, town or village in which the premises lie which are not violated by existing structures.

b. Consents by the seller or any former owner of premises for the erection of any structure or structures on, under or above any street or streets on which said premises may abut.

c. Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway."

As to damages arising from the seller's inability to convey title in accordance with the terms of the contract, paragraph 22 provides:

"[T]he sole liability of the seller will be to refund to the purchaser the amount paid on account of the purchase price and to pay the net cost of examining the title,

which cost is not to exceed the charges fixed by the New York Board of Title Underwriters, and the net cost of any survey made in connection therewith incurred by the purchaser, and upon such refund and payment being made this contract shall be considered canceled."

The closing date was originally fixed in the contract for December 3, 1980, however, at the time it was entered into, the City of New York had taken title to the Rockaway Boulevard property by a proceeding *in rem* because of the debtor's failure to pay taxes which had accrued against it (Tr., p. 16), and title had to be redeemed by application to the Board of Estimate of the City of New York. The processing of the redemption application was considerably delayed by the City and, consequently, the proposed closing date was postponed until this could be accomplished. These postponements of closing were agreed to between the plaintiff's and defendant's attorneys. On March 15, 1981, however, Michael Rose ("Rose"), the defendant's attorney, sent a letter to I. Louis Winokur ("Winokur"), the debtor's attorney, which stated:

"Despite the fact that more than seven months have elapsed since the making o[f] the contract, we understand that you still are not ready to close.

My client now insists that the transaction close within a reasonable time. Consequently my client fixes June 8, 1981 at 10:00 A.M., at Mr. Winokur's office as the time and place of closing and it makes time of the essence. Please confirm."

(Plaintiff's Exhibit 2)

On May 21, 1981, Winokur responded to Rose's letter as follows:

" . . . I am happy to report to you that the Board of Estimate will act upon the application for your property at the meeting of May 28, 1981. I am sure that the application will be granted. The City will then calculate the amount of taxes payable to them and we will pay them promptly.

In order to be sure of sufficient time to pay the taxes and obtain an order from the Court to cancel the foreclosure judg-

ment, I would appreciate it if you could give us a little more time, knowing how long it takes the city to do the slightest thing I think it would be safer to set the closing date for June 21 at the same time and place.

Please let me know in writing whether this is satisfactory to you."

Shortly after this letter was sent, the closing date was postponed to July 8, 1981 at Rose's request (Tr., p. 19) and soon after that postponed again, at his request, to July 27, 1981. Although the record is not clear, at least one and possibly both of these adjournments were requested because Richard Lofrese, a vice president of Flagship, had passed the Rockaway Boulevard property, noted a previously undiscovered asphalt driveway patch in the rear of the property, became alarmed, and had Rose order a survey. (Tr., pp. 85–86) (Plaintiff's Exhibit 4) The property was redeemed from the City before the scheduled July 27 closing date (Tr., p. 21), but the closing did not take place at that time because before then Winokur, the debtor's attorney, had requested an adjournment to August 10, 1981, which date was agreed to. The reason for his request was that he had learned that the new survey of the property had been completed and sent to the title company and he wanted to examine it and take any necessary steps in response to it. (Tr., p. 23)

On August 10, 1981, the parties met but Rose refused to close. A stenographic transcript (Plaintiff's Exhibit 5) was made of the discussion in which counsel articulated their positions.

Rose had basically two reasons for his refusal to close: first, he maintained that the terms of paragraph 16 of the contract of sale providing for title to be insured by U.S. Life Title Insurance Co. ("U.S. Life") were not met, and, second, he maintained that a consolidated mortgage being offered by Winokur instead of a new purchase money mortgage was unacceptable.

The reason Rose maintained that the insurance by the title company was not in conformity with the contract was that it was subject to details which were shown on

the survey of the property dated July 20, 1981 that Rose had commissioned. The survey (Defendant's Exhibit A), shows several encroachments, as well as various minor structures thereon. It shows that on the northwest side of the property roof eaves of a masonry garage encroach up to 3–¼" and the garage itself encroaches from 0" to 1–¼". The survey also shows in the northwest area of the property an irregular fence on an irregular corner curb that is from 2′11" to 3′9" from the northwest border of the property. There is, in addition, another irregular wood fence shown on the western side of the property that is 10′6–½" to 13′5–½" from the northwest boundary thereof. Finally, there is an asphalt driveway patch shown on the survey. Approximately one-half of this patch appears to be on the property that borders the Rockaway Boulevard property to the northeast and the other half of it appears to be on the debtor's property. The survey shows that the portion of the driveway patch that is farthest to the east extends into the debtor's property 3′1" from the survey line and the southeastern most portion of the driveway patch extends into the debtor's property 3′5". The length of the patch is not noted on the survey but, based on the scale at the bottom of it, it appears to be greater than 12′ but less than 16′.

The Certificate and Report of Title of U.S. Life 'Title Insurance Co. (Defendant's Exhibit D) certifies that "a good and marketable title to the premises . . . subject to the liens, encumbrances, and other matters . . . set forth in this certificate . . . may be conveyed . . . by Rego Crescent Corp." The Report also contains a "schedule B," which states:

"Schedule B in which we set forth the additional matter which will appear in our policy as *exceptions from coverage,* unless disposed of to the company's satisfaction prior to the closing of title or issuance of the policy. (Emphasis mine)

     *   *   *   *   *   *

5. Any state of facts a guaranteed survey of the premises might show. In the absence of a survey company does not insure exact courses, distances and dimensions.

By letter from Richard Lipman ("Lipman"), area counsel for the title company, dated August 10, 1981, paragraph 5 of Schedule B was amended to include the following:

"5. Survey (one line only at northwest side of premises under examination) made by Becker & Shea dated July 20, 1981 shows: Irregular wood fence up to 13′5–½" south of north line at northwest side of premises; irregular fence and concrete curb south of north line (approximate middle thereof) from 2′11" to 4′9"; roof eaves of masonry garage on premises adjoining on the north encroach up to 0′¾′ [*sic*] on premises under examination."

At the closing, controversy developed about the inclusion of this exception number 5. At trial, Rose testified that the following transpired:

"The title man [Mr. Lupoli] called his office and spoke to, I believe, Mr. Lipman to determine whether or not he could omit certain exceptions from the title report . . .

     *   *   *   *   *   *

He made a call and he would not omit various exceptions.

     *   *   *   *   *   *

Q I show you Defendant's Exhibit C, and ask you if these are the exceptions you are talking about.
A . . . These are some of the exceptions [in the amended paragraph 5 *supra*] and the title man just testified [*sic*] to another one they had written in in pen.
Q That one was which one?
A That was the [asphalt] driveway [patch].

     *   *   *   *   *   *

Q Okay. What happened after the title man discussed this matter with his office?
A He would not omit those exceptions and therefore I would not close."

(Tr., p. 75, *l.* 11—p. 76, *l.* 6)

Rose's testimony that the title company was going to add an exception for the as-

phalt driveway patch is buttressed by the testimony of Harry J. Bernstein ("Bernstein"), office counsel for U.S. Life Title Insurance Company. (Tr., p. 45) Mr. Bernstein did not participate in the August 10 closing (*id.*), but he testified that there was a penciled-in notation on the office copy of the letter from Mr. Lipman at the end of exception 5 that reads "asphalt driveway patch of premises adjoining on north approximately three foot, five inches south of northerly line." (Tr., pp. 67–68)

In response to Rose's objections to the exceptions in the certificate, Winokur suggested Rose obtain affirmative insurance (Tr., p. 93), but Rose chose not to request it at the time of closing. (Tr., p. 80)

Bernstein, who was called to testify as a witness for the plaintiff, insisted that U.S. Life would insure the title to the Rockaway Boulevard property irrespective of the exceptions referred to in the letter, Defendant's Exhibit C, and the title report, Defendant's Exhibit D. However, he was asked the following questions on cross examination and made the following answers:

"Q Now, Mr. Bernstein referring to Defendant's Exhibit C [the letter from U.S. Life amending exception # 5 to include the details of the survey], would you tell us what that exception indicated thereon means.

A Well, this is a reading of the survey on the basis of the survey presented to us by the applicant.

*          *          *          *          *          *

Q Would you tell us what an exception to the policy means?

A That isn't really an exception to the policy.

Q Mr. Bernstein, would you please answer the question.

A What an exception to the policy is?

Q Yes.

A Where something is being excluded from the coverage of the title insurance.

Q That means that your company would not insure anything that was an exception; is that correct?

A I would say so, yes.

Q I would ask you does this indicate, again referring to Defendant's C, that there is Exception No. 5 has been amended?

A Well, it's called—

Q If you please, Mr. Bernstein, will you please just answer the question.

*          *          *          *          *          *

A This letter does state that Exception 5 has been amended. I have a copy of that.

*          *          *          *          *          *

Q When Exception 5 has been amended to include [a] certain survey, does that mean that your company accepts [*sic*] those words and descriptions thereon from the insurance policy?

A Well, not in my opinion.

Q I'm just asking you, Mr. Bernstein, what the exception itself means. I am not asking you for your opinion. Does that mean at this point that that is excepted from the policy?

A Does what mean that it has been excepted from the policy?

Q Does an exception mean that you will not insure that which has been excepted?

A I would say normally, yes."

(Tr., p. 49, *l.* 17—p. 51, *l.* 12)

Notwithstanding this testimony, he repeatedly insisted that "['exception 5'] isn't really an exception to the policy." (Tr., p. 50, *l.* 1; *cf.,* Tr., pp. 53, 56) When asked about specific details, however, Mr. Bernstein's testimony differed. When Flagship's attorney asked:

"Assuming somebody parked a truck on that [asphalt] driveway patch and insisted that it belonged to them, would you pay on that claim? Or would you tell the insured that that is an exception to the policy?"

(Tr., p. 63, *ll.* 15–19), the following colloquy ensued:

"THE WITNESS: Well, if it was an exception to the policy, then we would pay.

Q If it was an exception to the policy, you would pay? Is that what your answer is?

A Excuse me. I misunderstood it. I said that wrong. No, if I was entertaining the claim if a truck was parked—if the neighbor's truck was parked—

Q When you say you would entertain the claim, what do you mean by that?

A I would submit it to our claims counsel for consideration.

Q For payment?

A For consideration.

Q You don't have the final say on it, do you?

A No.

Q You would have to submit it to someone for their approval?

A Yes."

(Tr., p. 64, *ll.* 1–18)

Rego Crescent also introduced the testimony of its attorney at the closing, I. Louis Winokur. After being qualified as an expert, he testified, in response to a hypothetical question as to his opinion of the details that were shown on the survey of the Rockaway Boulevard property, that he would not consider such a survey to raise proper objections to title. (Tr., p. 39, *l.* 18, p. 40, *l.* 10) and that these details are not "substantial to interfer [*sic*] . . . for [*sic*] the use and enjoyment of the premises." (Tr., p. 40, *ll.* 19–24)

The second reason Rose gave for refusing to close was that the mortgage Winokur had prepared was not the purchase money mortgage called for in the contract of sale. Rose explained:

"[T]hey were supposed to take back a purchase money mortgage and they did not want to take title that was already incumbered with a mortgage that I knew nothing about. On top of that, Mr. Winokur at the time and again today testified, that one of the people who had an interest in that mortgage was deceased. I don't think that my client had to get involved in that. They were supposed to give us lien [*sic*] title and take back the purchase money mortgage. They were not prepared to do it and therefore we did not close."

(Tr., p. 79, *ll.* 11–20)

Rose further explained that the closing date was the first time he was ever aware of Winokur's intention to tender a consolidated mortgage rather than that which was provided for in the contract of sale, that he was "absolutely unfamiliar" with any of the terms and conditions of the initial mortgage, and that he did not know any of the parties in the original mortgage. (Tr., p. 73) Rose also testified that, at the time of the closing, he had heard that there were some problems with a consolidated mortgage that had been taken from Rego Crescent by Flagship in a previous transaction. (Tr., p. 79)

Winokur conceded that he did not tender the requisite purchase money mortgage at the closing. Instead, he testified:

"I had in my possession an assignment of the mortgage against the existing mortgage held by the existing mortgagees to Rego Crescent. I also prepared a new mortgage for the difference. The exact amount I have here for $25,750.

\* \* \* \* \* \*

"[a] $10,000 interest was held by William Kohlman and his wife [K]atherine Kohlman. He died, so we had the assignment from the estate of William and from [K]atherine herself.

\* \* \* \* \* \*

"They held a $10,000 interest between them, and there was also an assignment by Joseph Goodfriend of his interest which was $7500, making a total of $17,500. I have that in my possession deposited with me by Henry Pattent the attorney for the parties.

"I might say he had also delivered to me previously which I also held, satisfactions of that mortgage. I had that in my possession, too. What I proposed to do is not satisfy them but to keep them alive . . ."

(Tr., p. 25, *l.* 18, p. 26, *l.* 25)

"I prepared a new mortgage . . . $25,750, and an instrument which consolidated those two mortgages into one lien of $43,250. And extending the time for the payment of that lien for 18 months from

August 10, 1981. Provided for payments of $2637.47 which included principal and interest at the rate of 12 per cent per annum.

\*　　\*　　\*　　\*　　\*　　\*

"[The amount of the] payment is what the contract called for.

(Tr., p. 27, *l.* 19, p. 28, *ll.* 13–14.)

\*　　\*　　\*　　\*　　\*　　\*

"... I offered, if that is what the purchaser insisted on, to satisfy the mortgages and to executed [*sic*] a new purchase money mortgage [with] precisely the terms set forth in the contract.

(Tr., p. 29, *ll.* 8–11)

\*　　\*　　\*　　\*　　\*　　\*

"I told [the title company] that although the mortgage on record was originally in an amount of $23,000, .... I stated that it had been reduced and that Edward Tymon [a former principal of Rego Crescent] had no residual interest in this property. I know I offered ... to produce whatever proof that the title company wanted to establish that fact. I also offered if the purchaser wanted to and I was perfectly willing to obtain a court order from the Bankruptcy Court to dispose of any possible residual interest which Edward Tymon may have had in there."

(Tr., p. 29, *l.* 15, p. 30, *l.* 1)

There is a conflict in the record over whether Winokur offered to tender satisfactions of the mortgages on the closing date: Rose testified that Winokur proposed an adjournment to obtain them (Tr., p. 82, *ll.* 14–23); Winokur testified that he was willing to satisfy the mortgage that day and that his offers to postpone for a short while were in reference to fulfilling any other conditions required by Rose or U.S. Life.

The transcript of the colloquy on the closing date (Defendant's Exhibit B) is ambiguous (Winokur: "I offer, if the purchaser so desires, to satisfy the existing mortgages and accept a purchase money mortgage for the full amount set forth in the contract upon the terms set forth therein. If the purchaser so desires, I offer to obtain whatever the purchase [*sic*] desires within such reasonable time as the purchaser may be willing to require"). (Defendant's Exhibit B, p. 4)

Finally, it should be emphasized that there is no dispute that Rose tendered the requisite amount of money at the closing. (See Defendant's Exhibit B) The evidence also showed that the purchaser had deposited $5,000 at the time the contract of sale was entered into and that the purchaser paid "$100 and change" for the title search and $200 for the 1982 survey of the property. (Tr., p. 77, *ll.* 3–19)

It is the plaintiff's contention that it has proved that it tendered an insurable title to the defendant in accordance with the terms of the contract of sale and that the exceptions contained in Schedule B of the Title Report, Defendant's Exhibit D, and the letter dated August 10, 1981, Defendant's Exhibit C, which amended paragraph 5 of that schedule to include the details of the survey of June 20, 1981, Defendant's Exhibit A, including the asphalt patch, were either of a *de minimis* nature or were in fact not true exceptions to the insurance coverage.

The leading case in New York interpreting the "insurable title" clause at issue here and apparently present in many contracts for the sale of real estate is *Laba v. Carey,* 29 N.Y.2d 302, 277 N.E.2d 641, 327 N.Y.S.2d 613 (1971). In that case, the Court of Appeals noted that the "usual construction" of insurable title clauses is that a seller "breaches his contract when the title company refuses to insure title unconditionally and without exception." *Id.* at 307, 277 N.E.2d at 644, 327 N.Y.S.2d at 617. Indeed, this rule has been reiterated and reaffirmed in case after case. *See, e.g., Kopp v. Barnes,* 10 A.D.2d 532, 204 N.Y.S.2d 860 (2d Dept. 1960); *Beacher v. Madera,* 226 N.Y.S.2d 227, 228 (Sup.Ct.1962) (purchaser not required to accept title insurance policy with "restrictions, encroachments, and survey variations—not provided for in the contract of sale.")

A case closely akin to the one before this court is *Beinhauer v. Morris,* 142 A.D. 398, 126 N.Y.S. 511 (1st Dept. 1911). In *Beinhauer,* the contract of sale provided that the seller was to convey a "good and marketable title" to the purchaser. The contract further provided that "[f]or the purpose of this agreement a good and marketable title shall be deemed to be one that either the Title Guarantee & Trust Company, or the Lawyers' Title Insurance & Trust Company, or the Title Insurance Company of New York will insure, in addition to a marketable title as defined under the laws of the state of New York." (*Id.* at 399, 126 N.Y.S. at 511.)

The sale was never consummated and the seller brought an action for specific performance. At trial, the evidence revealed that a survey had shown five minor encroachments and consequently one of the named title insurance companies would not insure the property except subject to the encroachments shown on the survey. Other surveys showed either no encroachment of the building that was located on the property or an encroachment by that building on adjacent property of 1–½″ on two sides. It was conceded at trial that the other two title insurance companies named in the contract of sale would issue no policy insuring the property except subject to an accurate survey. *Id.* at 399–400, 126 N.Y.S. at 512.

The court concluded that, even if the minor encroachments at issue did not make the property not marketable, the vendor was not entitled to specific performance. The court explained:

> "by the agreement of the parties the title which was to be tendered by the vendor was not merely such title as the law would hold to be marketable, but, in addition thereto, such a title as one of the three specified title companies would insure ... Plainly the agreement did not contemplate a policy of insurance which was conditional in its nature, or which contained reservations of matters entailing the determination of a court before they could be adjudged to be no cloud upon the title and without effect upon its marketability."

*Id.* at 400, 126 N.Y.S. at 512.

*See also Fineman v. Callahan,* 218 A.D. 854, 219 N.Y.S. 165 (2d Dept. 1926) (even if encroachments trivial, where contract of sale provides that seller give and purchaser accept title such as a title company will insure, proof that title company will not insure title except subject to the encroachments justifies purchaser in not closing).

While the Court of Appeals did hold in *Laba v. Carey,* 29 N.Y.2d 302, 277 N.E.2d 641, 327 N.Y.S.2d 613 (1971), that the inclusion in a title insurance company's policy of certain exceptions was not contrary to a contract of sale that included a clause requiring title to be insured by that company, the reason the court so held was that it found that the contract of sale had specifically contemplated those exceptions in the title insurance policy when it provided that the sale would be subject to :

> "4. Covenants, restrictions, utility agreement and easement of record, if any, now in force, provided same are not now violated.
>
> 5. Any state of facts an accurate survey may show, provided same does not render title unmarketable."

*Id.* at 305, 277 N.E.2d at 642, 327 N.Y.S.2d at 615.

In *Laba,* the title search that followed the execution of the contract of sale revealed that the land was encumbered by a recorded telephone easement and a "Waiver of Legal Grades" restrictive covenant (binding the owner of the property to install a sidewalk of legal grade whenever the city so directed). The title company consequently agreed to approve and insure good and marketable title only if the telephone easement and the "Waiver of Legal Grades" covenant were specifically excepted from coverage. The purchasers thus rejected the tender of the deed on the ground that the seller was unable to tender a good, marketable, and insurable title.

The court noted that "it is said that the title company's approval must be unequivocal unless the exceptions are those contemplated by the contract" and, applying that

rule, determined that the contract at issue in the case before it had "specifically provided" for the exceptions that the title company was excepting from coverage. *Id.* at 308, 277 N.E.2d at 644, 327 N.Y.S.2d at 618. Consequently, the court held that the purchasers should have accepted the tender.

The underlying principle of all these cases is that "[t]he purchaser is not bound to buy a law suit," *New York Investors, Inc. v. Manhattan Beach B.P. Corp.,* 229 A.D. 593, 601, 243 N.Y.S. 548, 558 (2d Dept. 1930), *aff'd,* 256 N.Y. 162, 176 N.E. 6 (1931), nor is the purchaser compelled to be haunted by the specter of litigation when that purchaser has contracted for an insurable title.

In its trial memorandum, plaintiff cites several cases in an attempt to support its position. These cases, however, are all inapplicable to the facts in this case. First, the plaintiff cites three cases in which the attributes of a marketable title were defined. Two of these cases, *Ungrich v. Shaff,* 119 A.D. 843, 105 N.Y.S. 1013 (1st Dept. 1907), *aff'd,* 130 A.D. 902, 115 N.Y.S. 1147 (1909), *aff'd,* 198 N.Y. 565, 92 N.E. 1105 (1910) and *Noethinger v. Jeffries,* 108 Misc. 372, 177 N.Y.S. 577 (Sup.Ct.1919), discuss what minor physical encroachments are too *de minimus* to render a title unmarketable, and the other case, *Norwegian Evangelical Free Church v. Milhauser,* 252 N.Y. 186, 169 N.E. 134 (1929), deals with a more general cloud on title. These cases are inapplicable because here the central question is whether the title company was willing to insure the title in accordance with the agreement reached in the contract of sale, not whether the property was unmarketable. *Cf., New York Investors, Inc. v. Manhattan Beach B.P. Corp.,* 229 A.D. 593, 598–99, 243 N.Y.S. 548, 555–56 (2d Dept. 1930) (insurable title and marketable title are different safeguards); *Flanagan v. Fox,* 6 Misc. 132, 137, 26 N.Y.S. 48, 51 (C.P.1893) ("a covenant to tender a title such as the title company will approve, is not the same . . . as to tender a good title, one free from valid legal objection.") Plaintiff also cites two cases, *McGraw v. Selkis,* 245 A.D. 786, 280 N.Y.S. 921, *aff'd,* 269 N.Y. 534, 199 N.E. 522 (1935) (mortgage foreclosure sale) and *Merges v. Ringler,* 34 A.D. 415, 54 N.Y.S. 280 (1st Dept. 1898), *aff'd,* 158 N.Y. 701, 53 N.E. 1128 (1899) (judicial sale), for the proposition that when there are minor encroachments specific performance with a proportional abatement of the purchase price can be awarded. Again, those cases are not on point because they deal with marketable title rather than with the case where a purchaser has bargained for an insurable title. Finally, plaintiff cites one case, *3120 Realty Corp. v. Tong,* 6 Misc.2d 909, 162 N.Y.S.2d 476 (Sup.Ct.1957), *aff'd,* 5 A.D.2d 796, 170 N.Y.S.2d 997 (3d Dept.), *aff'd,* 4 N.Y.2d 1005, 152 N.E.2d 537, 177 N.Y.S.2d 518 (1958), that deals with what constitutes insurable title. In that case, the seller had contracted to provide "title such as [either of two title insurance companies] will approve and insure." *Id.* 6 Misc.2d at 909–910, 162 N.Y.S.2d at 477. The title report stated that the title was subject to "rights of others to the natural and unobstructed flow of the brook crossing premises." *Id.* at 910, 162 N.Y.S.2d at 477. The brook at issue proceeded in its natural bed. The court held that, nevertheless, the title was being insured unconditionally and without exception because the New York State Court of Appeals had specifically ruled, in an earlier case, that such a condition did not constitute an easement, encroachment, encumbrance or defect in title. In this case, by contrast, exceptions involved actual or possible easements and encroachments, and the reiteration of the general rule by the *3120 Realty Corp.* court is applicable:

> "[an] agreement [to insure] contemplate[s] such a policy of insurance as would not contain any matter, item or thing which constitute[s] a defect or an encumbrance nor any other matter with respect to which there [is] *any possibility* or probability of any defect, cloud, claim or encumbrance entailing the determination of a court before the same could be adjudged to be of no effect upon the title and without effect upon its marketability." (emphasis mine)

*Id.* 6 Misc.2d at 911, 162 N.Y.S.2d at 478.

Plaintiff also stresses that Mr. Bernstein testified that "his company would have

granted affirmative insurance despite the so-called 'exceptions' which were raised, which he characterized not as 'exceptions' but merely as a reading of conditions that existed." (Plaintiff's Post-Trial Mem. at 13). The short answer to this argument is that Bernstein, who did not represent U.S. Life at the closing, also testified that, in the event that a claim to adverse possession of the asphalt driveway patch were made, he would have to consult with counsel to determine whether the title company would defend the claim. *See supra*, p. 13. That is not insurance without exceptions. More importantly, even if he had been the title company representative at this closing and even if he had assured Rose that any such claim would be defended, the contract of sale did not compel Rose to rely on these assurances. Rose had a right to rely solely on the written insurance contract that would be forthcoming, not on the subtle metaphysic that an exception is not an exception.

Equally unconvincing is the argument propounded by plaintiff's counsel that "it may well be that a simple inquiry to the City of New York would establish that it [the asphalt driveway patch] was improperly and unlawfully placed on the property," (Plaintiff's post-trial memorandum at 17b) and plaintiff's related contention that "[Winokur's] information [was] that this driveway patch and concrete curb were installed by a City contractor when the road was repaved . . . the adjoining owner . . . makes no claim to any portion of the property beyond the southerly line of his land." (Plaintiff's Post-Trial Mem. at 24) These facts, if true, would certainly have lessened the risk of taking the property, but the agreement was that whatever the risk it was to be insured against by the title company. The title company could have made the simple investigation or relied on Winokur's information, and then issued insurance without exceptions.

Finally, in its memorandum plaintiff contends that it "is obvious . . . that, apparently, the defendant was . . . seeking some way out of its bargain and contract." (Plaintiff's Post-Trial Mem. at p. 17b).

That conclusion is not mandated by the record, *see supra*, p. 6, but even if it were, or even if defendant had mixed motives in refusing to close, this would not excuse the plaintiff from furnishing an insurable title in accordance with the terms of its contract. Although the purchaser can bargain to take property subject to certain easements or encroachments, *see Laba, supra*, p. 20 the purchaser is not required to take less than that which was bargained for.

In the case at bar, the parties did bargain for specific limitations on or potential threats to the fee. Those limitations are outlined in paragraph 6 of the contract of sale. *See supra*, p. 3. These limitations did not include minute encroachments of the neighbor's garage, nor, more importantly, did they include the possible evidence of adverse possession, the asphalt driveway patch. Consequently, there was no contemplation in the contract of the exceptions that U.S. Life would not insure without. The plaintiff did not produce a title insured by U.S. Life as required by the contract of sale. Because Rego Crescent breached, it is not entitled to specific performance and judgment is rendered in favor of the defendant.

Pursuant to paragraph 22 of the contract of sale, *see supra*, p. 4, defendant is entitled to a return of the $5,000 deposit, $100 for the title search and $200 for the survey on its counterclaim.

Because of the disposition of this case with respect to plaintiff's failure to tender insurable title, I need not determine whether Rego Crescent also breached by failing to tender the mortgage provided for in the contract of sale.

Settle judgment in accordance herewith within ten days.